The final case this morning is number 18-1802, Smarten, LLC, versus Samsung Electronics. Good morning, Your Honor. It's Robert Vander Heid for the plaintiff appellant. Wait, wait, wait, wait, wait a minute. Okay, Mr. Vander Heid. I'm sorry. Robert Vander Heid for the plaintiff appellant, Smarten. This case, as you know, relates to the abstract idea aspect of the patent law. And I submit that the district court's opinion was more like Alice in Wonderland than it was like Alice Appliance. In the red brief at 25, Samsung says, Smarten has waived any reliance on its purported 32 machine elements by not presenting them to the district court. Smarten never presented to the district court Table 1, appearing on pages 8 through 17 of its opening brief. It never broke a claim into machine elements. And it never used machine elements to argue that the claims contained improvements to the underlying device. And then they say it's waived. Where in the record below did Smarten break a claim into machine elements? Well, we argued all of the machine elements in the brief that we filed. We referenced the portions of the claims that related specifically to them in the oral argument. Where did you use the word machine elements below? I'm sorry, Your Honor, it's in our reply brief. I don't remember exactly what page it's on in the reply brief, but we put specifically in there where it was. And also in the oral argument, we said that there are more than 30 elements in the claims that must be considered, both hardware and software. And under the Pfizer v. Lee case, which we cited, which in fact then cites Yee, it says that if the issue is considered below, then it doesn't make any difference whether you use exactly the same terminology or not. And the only issue considered below was Section 101. Therefore, we don't believe that there's any waiver with respect to anything. You mean as long as 101 is the issue, you can make any new points on appeal that you want to without calling into the attention of the district court? Well, that's what the Pfizer v. Lee case said with respect to Section 132. And they again cited Yee case from the Supreme Court, which says that specifically in the quotation. What was Pfizer v. Lee about? Pfizer v. Lee was simply the only relevance to this particular case because it was a chemical case. The only relevance to this case was whether or not an issue considered below, you can use different language and bring up different points on appeal if that issue was considered. And in the Pfizer v. Lee case, it was Section 132. Here it's Section 101. The difference is inconsequential. As long as it's the same section, you can say anything you want even though you didn't tell the district court about it? Well, I'm not sure, Your Honor, that you can say anything that you want. But certainly in the context of this case, we can. We argued all sorts of aspects with respect to abstract idea below. And we used some of the exactly the same terminology. And the fact that here we're restricted in the number of pages that we could use, and here we have a more reasonable amount that we can use. You had pages, essentially nine, ten pages of your opening brief devoting to listing these so-called machine elements. Yes. Your references below are that you said at Appendix 920 you referenced more than 30 specific elements. That's it. Yes. Okay. You don't list for the court below this ten pages of supposed machine elements. And that you said at one point, at 877, in passing, the numerous machine elements of the advantageous combinations. How do you get to that list that you've given us? Well, because when we said the machine elements there, that was in the context of discussing all of the things that were in the claims that relate to no abstract idea. And we had discussed all of the features of the claims that are the same as they are in the Table 1 that we have now prior to that. Okay, so the fact that we didn't use the term machine elements and didn't specifically identify them by number, giving a number to each one of them, is inconsequential. They were there. They were discussed. The district court considered them. The district court was aware of them. And just like in the Nelson v. Adams case, the Supreme Court, when the court is made aware of the situation, that's the significant thing. Let's turn to merits. In the red brief, okay, in the blue brief you argue, the district, at page 34, the district court misinterpreted the specification to mean that a pedometer is conventional in a mobile computing device when in fact it states exactly the opposite. In the red brief at 33, 34, Samsung says, even on its own terms, however, Smarten's argument fails. Smarten contends that a statement in the specification that, quote, mobile computing devices may be modified to include a pedometer, close quote, indicates that pedometers were not conventional. Putting aside Smarten's acknowledged oral argument on the motion to dismiss that, quote, there's nothing new about a pedometer, Smarten's reliance on the sentence is taken out of context and ignores the rest of the specification. For instance, the next sentence discloses that the invention can be implemented using, quote, the commercially available iPod Nano with a built-in pedometer. How does your argument that the district court err in square with that language in the 640 pad? Because the Nano iPod has nothing to do with a smartphone or a laptop or any of the computer devices that were concerned with the invention. The only reason that was cited was because it's an example of the fact that a pedometer is a known product. Actually, in our situation here, we have exactly the same situation that you confronted in Thales. There, there were two sensors that were known per se that were used to get an advantageous result with respect to measurement. The spec also talks about using a pedometer with an iPod or an iPhone in that same column, right? No. As far as we're concerned, there's never been the use of a pedometer before in a smartphone. For example, the commercially available pedometer used with an iPod or iPhone that receives pedometer transmissions from a shoe. I get it that the pedometer is attached to your shoe and it's receiving a transmission with your iPhone, but it's virtually the equivalent of having the pedometer and iPhone together, isn't it? No. In fact, I don't believe it is, Your Honor. I think the situation here is, again, exactly what was confronted with in Thales, where you have two things that are known per se, and when you combine them, you get an advantageous measuring result. That's exactly the same thing we have here. When you add the pedometer with the GPS receiver in our invention, what that results in is an improved measurement. For example, before, if you had just the GPS receiver, which was known per se in smartphones, you would not be able to track someone walking up the stairs, someone running in place, perhaps not even in a treadmill. Whereas in our situation, you have that exactly, so that you can count the steps. And that's, in fact, what I do every day when I use a smartphone, the Samsung smartphone. At 43, Samsung says, Smarten did not argue before the district court that storing a user's favorite foods improved, this is an Enfish argument, improved the storage subsystem. Only the favorite foods feature improved, quote, user friendliness by improving the computer device's data entry requirements, close quote. Thus, Samsung says your alleged database structure improvement analogy to Enfish is vague. Well, it says in the specification, including portions of the specification that was specifically brought to the attention of the district court. Where? How is your favorite food database structure improvement argument preserved below? Your Honor, the claims, I mean, the specification here is over 100 columns long, and I cannot cite to you that right offhand. When I take the time. You're supposed to come to the argument with the knowledge of the record and your briefs, that's what you're supposed to do. I'm sorry, I'm just not smart enough to commit to memory the 100 columns of the patent. You're allowed to make notes. Okay, but when I sit down for rebuttal, I will find that for you. But in actuality, that is directly in the specification. And in all of these court cases. Did you argue that language to the court below? Yes. Where was that in the record? That is where it will find for you. Okay. It's in the appendix, but I can't tell you that also the appendix is, you know, hundreds of pages long. Okay, at red brief 48, Samson says that page 48 and 49 of your blue brief are the first time in this case that any argument regarding PACE feedback and its impact on patent eligibility has appeared. Where in the record was that? We specifically quoted to the district court the sections including appendix page 69 where PACE was discussed. In other words, when we were talking about the advantages of the invention, we specifically referenced the columns that include that. Where in the record, I see you're talking about the patent. Where in the record below did you raise that to the district court? It was raised, again, I can't cite to you exactly the page of the appendix that it was raised in or the argument was raised. But we specifically brought to the district court's attention a certain section of the specification which included appendix, present appendix page 91, which is column 69 of the patent. And that's where PACE is discussed. And we brought it up and we specifically talked about the walk-run ladder there, which is what the PACE relates to. What would you say is the inventive concept here in this claim? The inventive concept in this claim is that we are able to have a handheld mobile computing device that allows you to, in a user-friendly, non-cumbersome manner, which is what was in the prior art, enter food and exercise data so that you can get immediate feedback to tell you how you're doing with respect to that. Something that was not done in the prior art before. As a matter of fact, I think that probably the most relevant part of all of the arguments and briefs about it is what the patent office said. In appendix page 439, when the patent office gave the reasons for allowance, they first of all discussed all sorts of other prior art devices and listed them. And then they said that the combination of references teaches a device which provides for monitoring and advising of food intake and exercise. In other words, that's in the prior art. That's something that anybody can do if they want to, but cannot meet all of the limitations present in the instant claims. What we've done here is advance the art with respect to that. What was the advance in the art over the concept of having some device that you can use as a bookkeeping of information you're entering into it? Well, the device that we have is much more user-friendly. It has a number of things where it improves the functionality of the computer. Like what? Okay, the way that it improves the functionality are, first of all, it has the generation of the favorite foods. And what that does is it not only makes it easier to enter – But that's not computer functionality, is it? Yes, it is, because what you're doing – It's a choice as to which data to display. But what it does is it means that instead of having to enter something multiple times – in other words, if you have Cheerios with blueberries for breakfast every morning and you want to keep track of that, instead of having to enter that every time, you just put it in once. And then when you enter the system and you go to the screen that says that you're going to do food, you just push Cheerios with blueberries. That automatically puts in there how many calories – Isn't that just like bookmarks that you have with a web browser? You have these little shortcut entries. We said in Intellectual Ventures vs. Erie that those kinds of bookmarks are just abstract ideas. But in Core Wireless, it was exactly the opposite. We have the same situation as in Core Wireless. Where we're here, what we do is, especially for a small screen, we allow you to access the information much more quickly, and it limits how many screens you have to go through. For example, in Core Wireless, you had to go through three or four screens if you put in one entry. Whereas if you hit what is equivalent to our favorite foods, you only have to go to one screen. Okay. You're well into your rebuttal time. Why don't we hear from Mr. Rainey. Thank you. Good morning, Your Honors, and may it please the Court, Richard Rainey here on behalf of Samsung. The District Court, in a thorough and well-reasoned opinion, found the claims at issue invalid as directed to patent-ineligible subject matter for two independent reasons. I don't think I've ever seen a claim this long. I've been in the game for a long time, but I've never seen a claim this long. Yes, and this Court has addressed lengthy claims in the past and has said that the length of the claim is not dispositive. It's the content of the claim that matters. So this case falls squarely within the electric power group case and other cases where the Court has confronted lengthy claims. We have electric power group. We also have core wireless. Can you help me think through why this can't possibly fit inside of core wireless? Sure. Without mentioning electric power group. Yes. Core wireless is, in our opinion, completely distinguishable from the user interface, if you want to call it that, at issue here. In core wireless, you had a very specific, specialized claim directed to an improved user interface that allowed you to peek into an unlaunched application behind the button you were looking at. So that, for example, if you had a window that said email and you could activate that window and it would give you menu items to the unactivated email program behind it and let you go in there and perhaps select compose without having to go through multiple screens to get there. By contrast here, if you look at the claims at issue, as lengthy as they are, when talking about the user interface, all that is mentioned are symbols. For example, food, exercise, and – Favorite foods. That's a shortcut. That is – Now we're in favorite food land very quickly and don't have to fight through multiple windows in order to get to the favorite food page. But the problem we have here is in the claims, there's nothing specific or special that's mentioned about those symbols other than that they have information on them. If I have a calendar, oh, an old-fashioned paper calendar, and I write in the corner, upper corner, CB to tell me that I had Cheerios with blueberries, have I just invented a shortcut? You have. And in fact, there's nothing unconventional about shortcuts at all. This is a 2013 patent that has the iPhone 4S and 5 as conventional technology. Those devices had very sophisticated icons allowing you to shortcut your way all over the place through an iPhone. So the notion that a claim to something as basic as a symbol could be an improvement to the existing technology is, we think, not supported on this record. If I might just turn for a moment to the GPS and pedometer point, the specification in this case talks about two fairly unremarkable alternative embodiments. One has the pedometer outside the shoe. That's conventional. One has the pedometer inside the housing along with the GPS. That's also described as conventional. There's nothing to this invention as it relates to the pedometer that's anything unconventional. But even if you were to accept for a moment— Well, they say that combining the pedometer with the GPS was unconventional. So we think the specification plainly says that figure one, which shows a pedometer either inside or outside, is described as conventional. But even if you accept the argument that there might have been something novel about placing a pedometer inside the housing along with the GPS, this court has made it clear that novelty and eligibility are two different standards. It's a different test. In fact, if you want to know what this invention is directed to, step one under Alice, the original claims in this case did not include any limitation to the location of the pedometer inside the housing. And in fact, the specification draws no distinction between the two in terms of anything with respect to the invention. Either one can be used. What this invention is directed to, as the district court correctly found, is the collection of a whole bunch of data from a whole bunch of sensors, including a pedometer and a GPS, and doing a bunch of things with that data, precisely as this court confronted in Electric Power. So even if there was something perhaps new about it, the specification lists no technical challenge to it, no technical superiority to it. It's just an unremarkable alternative to approaching that claim. Okay, thank you, Warren. The court has no further questions. Are we supposed to just say everything in this claim is conventional? A food monitoring subsystem is conventional. An exercise monitoring subsystem is conventional. Every single noun in here is conventional, and so therefore there's no inventive concept. So what I would say is if we follow the approach that this court laid out in Electric Power Group, each one of those is nothing more than the collection, analysis, and display of data. And laying additional layers of data on top of additional layers of data and additional layers of analysis on top of additional layers of analysis doesn't change the result. This court's made that clear. Placing abstract concepts on top of abstract concepts doesn't change things. But even under fair warning, it's very clear, the spec admits, that people have been doing these very kinds of activities for a long time in various formats, computerized and otherwise. I think what this invention is fairly directed to, as it says in the abstract and elsewhere, is simply porting those over into a conventional technology environment. So the answer to your question is that the addition of all of these layers of text don't change the result at all under Section 101. Okay. Thank you, Mr. Rainey. Thank you very much. Mr. Vanderhaan? I need to return to the whole idea behind the abstract idea concept set forth by the Supreme Court in 1853 and carried all the way through the 2014 Alice case. And that is you don't want to have something so broad and so nonspecific that it retards the art. Here, this is the epitome of a particular specific invention, which is recited in the claims. And they can, if they want to use the prior art devices, those that the patent office talked about, that do the food intake and do the exercise, let them do it. But instead what they do is put in over 100 million commercial products exactly what is set forth in these detailed claims. These claims are specific. They tell you how to do something. They set forth the advantages of doing it. And they're exactly the same as the situation in various parts thereof as core wireless fails in NPHISH. Thank you. Thank you, Mr. Vanderhaan. I thank both counsel. The case is submitted. That concludes our session for this morning.